# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 2, 2010

## JAMES HATHAWAY v. STATE OF TENNESSEE

Appeal from the Shelby County Criminal Court
No. P-22023      W. Otis Higgs, Jr., Judge

**No. W2009-02428-CCA-R3-PC  - Filed June 13, 2011**

The Petitioner, James Hathaway, appeals the Shelby County Criminal Court's denial of post-conviction relief from his convictions of first degree felony murder and especially aggravated robbery, for which he is serving consecutive sentences of life without parole and twenty-five years.  On appeal, he contends that trial counsel rendered ineffective assistance by failing to request lesser included offense instructions and failing to obtain additional expert assistance. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Joseph A. McClusky (on appeal) and Larry Sargent (at trial), Memphis, Tennessee, for the appellant, James Hathaway.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tom Hoover, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The facts of the Petitioner's crimes were summarized by this court on direct appeal:

The proof at trial revealed that, in December of 1993, the victims in this case, Elbert Dan Swartz and his wife, Maxine Swartz, owned and operated Keyport Self-Storage, a mini-storage facility in Memphis. The couple's residence was attached to the office of the business. Mr. Swartz was a sixty-one year old retired Memphis police officer.

On December 14, 1993, as Mr. Swartz was locking the office door at closing time, the appellant and a co-defendant, each carrying a handgun, entered the business. Mrs. Swartz, who was in the residence area, heard the beeping sound which indicated that the office door had been opened. Seconds later, the appellant and the co-defendant, Abraham Galmore, entered the Swartzs' apartment. The appellant grabbed Mrs. Swartz and demanded money, while Galmore held a gun to Mr. Swartz's head. Mr. Swartz replied that they did not have any money. The appellant then began kicking and shoving Mrs. Swartz toward the bedroom, where he forced her onto her knees. Pointing his weapon at the back of her head, the appellant informed Mr. Swartz that, if he didn't produce some money, he would "blow [Mrs. Swartz's] brains out." After hearing his wife's pleas for compliance with the intruder's request, Mr. Swartz took two bank bags from the bedroom. The appellant remarked, "Ms. Maxine, I sure hate to do this to you," and then shot Mrs. Swartz in the back of the head.[1] Galmore retrieved a knife from the kitchen and the two men took turns stabbing the already wounded Mrs. Swartz in the throat.

The perpetrators then returned to Mr. Swartz and shot him in the back of the head. As the assailants argued over who

---

[1]At trial, Mrs. Swartz advised that, prior to this incident, she and her husband had employed the appellant to perform odd jobs, including "detailing" their automobiles. She continued that, on numerous occasions, her husband had loaned money to the appellant and that the appellant was welcomed [sic] in their home.

2

would stab Mr. Swartz, one held Mrs. Swartz by the back of the head, forcing her to watch the execution of her husband.[2]  The two men then pillaged through [the] victims' personal belongings, taking jewelry, Mr. Swartz's father's watch, money, and various handguns. Before leaving the apartment, the appellant grabbed Mrs. Swartz by her hair and jokingly remarked to his companion, "Don't waste another bullet on her. She's already dead too." After the two assailants left, Mrs. Swartz crawled to the telephone in the living room and dialed 911. Concerned that her attempt was unsuccessful, she contacted her granddaughter who also notified 911.

Paramedics arrived at the scene at approximately 5:59 p.m, and discovered Mr. Swartz laying [sic] face down in a pool of blood.  He was pronounced dead at the scene.  Mrs. Swartz was in shock from the loss of blood. The paramedics, believing her condition to be critical with a high risk of death, inquired as to whether Mrs. Swartz could identify her assailants.  She replied "James" and a last name indiscernible to the paramedics.  Before being transported to the hospital, she was able to state, "James Hathaway did it."

After fleeing the scene, the appellant and Galmore went to the apartment of Roy Ballard.[3]  Ballard observed that the appellant was carrying two handguns and Galmore was armed with a knife. Galmore handed the knife to the appellant who began washing off what appeared to be blood from the knife. Ballard noted that the appellant had blood on his person and clothing. Ballard also observed that the two men "had a lot of money."  After leaving Ballard's apartment, the appellant proceeded to the Sun Inn Motel, where he registered in his own name. The appellant then purchased $250.00 worth of crack

---

[2]Regarding the stabbing, the appellant stated "I want my share of this."

[3]Ballard also related that the appellant and Galmore had visited at his apartment earlier that afternoon and that he had overheard the two planning a robbery or in their terms, "going to make a sting."

cocaine which he smoked. At 11:00 a.m. the following morning, the appellant telephoned his mother and told her that he had done something awful. He was then taken to the police station by his mother and her husband.

At the police station, the appellant appeared normal and was willing to talk with police officers. After being advised of and signing a waiver of rights, the appellant gave a statement in which he admitted that he had shot Mr. Swartz. He stated that "a man he only knew as Greg" accompanied him during the "robbery/murder."[4] Narrating the events of the prior evening, the appellant stated that "Greg put a pillow to Dan's head and told [the appellant] to shoot. And [the appellant] shot once. Greg then shot Dan two more times. . . . Greg came out of the bedroom and went in the kitchen and got a knife." He stated that "Greg" had stabbed Dan. The appellant recalled that "[he] took Maxine back into the bedroom where Dan was. [The appellant] advised that he did not shoot or stab Maxine." At the conclusion of this statement, the appellant telephoned his parents and live-in girlfriend, Stella Martin.

After completing his telephone calls, the appellant, again, voluntarily waived his rights, and stated that he wished to make a second statement. The appellant related that

> [he] went to Dan's to go borrow some money. [He] got out and went inside and Dan opened the door for me. Greg was still in the truck when I got out. When I got inside he came in like before that door closed. He was inside in the back of me. He, Greg, had the gun in his hand; and he said this is a robbery. At that point, Greg took Dan to the bedroom and told him to sit down. Greg told

---

[4]Testimony revealed that "Greg" was Abraham Galmore's nickname. Prior to the appellant's trial, Galmore was convicted of criminally negligent homicide and especially aggravated robbery. He was sentenced, as a career offender, to sixty-six years in the Department of Correction.

4

Maxine to get in here, and she was talking real drowsy like. . . . Greg asked him, where is the money. Dan told me it was under the bed, and I got it out. Dan kept asking me, why am I doing this. I'll give you the money if you ask me for it. From there Greg grabbed a pillow, put it to the back of Dan's head, handed me the pistol and said shoot. And I shot him once. Him and Dan got to fighting, and after I shot him, I gave Greg the gun back. I went in the living room and got the money out of the drawer. After I got the money, I heard the shots. . . . Greg was going in the kitchen. He came out the kitchen with a knife. . . . Then Greg went back in the room and Dan and Greg started scuffling again. Greg started stabbing Dan with a knife. Then he was just stabbing and Dan was kicking.

The appellant again denied stabbing or shooting Maxine Swartz. However, he stated "There ain't no excuse for doing what I did. I'm sorry, but it won't change anything."

Testifying in his own defense, the appellant related that, on the date of these crimes, he had been smoking crack cocaine earlier in the day. He was later joined by Galmore at Ballard's apartment where the two continued to use cocaine. The appellant testified that he had no recollection of the events transpiring after he left Ballard's apartment until the next morning when he awoke in the hotel. The appellant revealed that, in 1984, he suffered a gunshot wound to the head. As a result of this incident, the appellant's equilibrium was affected and, subsequently, he underwent surgery, a labyrinthectomy, to correct this problem. The appellant related that the bullet is still lodged in the back of his skull. After this injury, the appellant began suffering seizures, for which he takes 100 milligrams of Dilantin per day. Moreover, in order to obtain relief from the

5

pain suffered from this injury, he began using illegal drugs, including heroin, cocaine, crack, and PCP.[5]

Dr. Marsha Little, a clinical psychologist with a speciality in neuropsychology, performed an evaluation of the appellant.[6] Testifying on his behalf, she opined that the appellant has "difficulty in abstract reasoning, social judgment, [and suffers from] impulsivity."[7] Dr. Little diagnosed the appellant as mentally ill and suffering from an organic mental disorder resulting from damage to the brain caused by structural insult. Specifically, she stated that, as a result of the gunshot wound, the appellant endured impairment of the functioning of the front temporal lobes of the brain. In sum, Dr. Little concluded that on the evening of December 14, 1993, the appellant was unable to control his impulses.

In rebuttal of Dr. Little's diagnoses, the State called Drs. John Whirley and Wyatt Lee Nichols, both clinical psychologists. Dr. Whirley conducted an interview of the appellant during which the appellant indicated a lack of memory of the criminal episode. Acknowledging that the appellant was admittedly "high" on cocaine at the time of the offense and that "a drug dependant state can affect memory functioning," he determined that, at the time of the offense, the appellant "was able to appreciate the wrongfulness of the behavior; and he was able to control his behavior or conform his behavior to the requirements of the law." Although Dr. Whirley admitted that the appellant has a substance abuse history of twenty-five years

---

[5]On cross-examination, however, the State revealed medical reports from 1991 which indicated that the appellant began his abuse of illegal substances at the age of thirteen.

[6]At trial, "neuropsychology" was defined by Dr. Little as a study of the relationship between the brain and behavior. It includes the study of individuals who have suffered brain trauma "and how they function in their daily world."

[7]Dr. Little defined "impulsivity" as the inability to think before one acts or makes statements.

6

and that the appellant may be suffering from depression, he concluded that these observations are not "remarkable or a mark of insanity. It's actually a mark of some reality to be depressed when you're facing these kinds of charges. But I saw no evidence of psychosis which is the most common thing that we would expect if one had access to insanity." With regard to Dr. Little's conclusion that the appellant suffered from impulsivity, Dr. Whirley countered that "[h]e may be impulsive, but I think he's been impulsive since he was small." He explained that impulsivity is "more of a symptom or a personality trait" and not a diagnosis or a mental disorder. Moreover, impulsivity "doesn't take away one's ability to appreciate the wrongfulness of behavior or to conform to the behavior to the law." Based upon the circumstances of the criminal episode, Dr. Whirley found evidence of planning which negated the suggestion of an impulsive act. Furthermore, he could not confirm Dr. Little's diagnosis of organic brain damage.

Dr. Nichols also testified as to the appellant's mental state. Dr. Nichols conducted two mental examinations of the appellant. Dr. Nichols determined that the appellant was competent to stand trial and that the appellant did not suffer from a mental illness. Regarding Dr. Little's diagnosis of impulsivity, Dr. Nichols responded that, although

> he might have impulse control problems . . . that really doesn't mean much. Most people with an antisocial personality . . . that's one of the cardinal symptoms of that -- impulse control problems. Most people with chronic chemical dependency histories, . . . it's not unusual at all for him to have impulse control problems. And when he's intoxicated or high, then he's going to more likely have trouble with his impulses. I mean, that's true for anybody as a general rule.

Regarding the present offenses, Dr. Nichols determined that they were goal directed, and not an impulsive act. In summary, he concluded that "[the appellant] was not out of touch with reality or distorting reality past anything that would

7

be accounted for by being intoxicated. . . . His behavior was still goal oriented."

Based upon this evidence, the jury convicted the appellant of felony murder and especially aggravated robbery.

State v. James Hathaway, No. 02C01-9702-CR-00082, Shelby County (Tenn. Crim. App. Dec. 30, 1997), app. denied (Tenn. Oct. 12, 1998); cf. State v. Galmore, 994 S.W.2d 120 (Tenn. 1999) (appeal of separately tried co-defendant's convictions).

At the post-conviction hearing, trial counsel testified that he was appointed to represent the Petitioner at trial. He said that a notice of intent to seek the death penalty had been served and that co-counsel was also appointed.

Trial counsel testified that at the time of the offense, the mens rea requirement for felony murder was reckless disregard for life and that the period of time in which this mens rea applied to the offense was brief. He did not recall the specific jury instructions the defense requested, other than the "standard jury instructions" and an insanity defense instruction. After reviewing the charge, he said that the jury was given instructions on the charged offenses and second degree murder. He stated that at the time, the law required the judge to find that the elements of the lesser included offenses were included in the charged offenses before instructing the jury on the lesser included offenses. He said the lesser included offense of felony murder would have been second degree murder. He did not recall the holding of State v. Gilliam that the only lesser included offenses of felony murder were reckless homicide and criminally negligent homicide. See 901 S.W.2d 385, 390-91 (Tenn. Crim. App. 1995) (holding that under the test of Howard v. State, 578 S.W.2d 83 (Tenn. 1979), second degree murder was not a lesser included offense of felony murder because second degree murder required a higher "knowing" culpable mental state than the "reckless" mens rea of felony murder). Trial counsel said the lesser included offenses of especially aggravated robbery would have been facilitation of especially aggravated robbery, armed robbery, robbery, attempted robbery, theft, aggravated assault, and assault.

Trial counsel testified that the proof at trial showed that the co-defendant, Abraham Galmore, fired the shots that killed the victim. He said the defense was insanity. Trial counsel agreed that the defense encompassed the argument that the Petitioner acted with diminished capacity due to a brain injury and drug use and that he was coerced by his co-defendant. He said counsel attempted to show that the Petitioner's drug use was precipitated by a bullet lodged in his brain, which caused the Petitioner great pain and lack of impulse control.

Trial counsel testified that in retrospect, he realized it would have been reasonable to request facilitation as a lesser included offense instruction. He agreed that aside from felony murder, all of the charges required a knowing mental state, which the defense argued the Petitoner was incapable of forming. He said that instructions of second degree murder, voluntary manslaughter, criminally negligent homicide, and reckless homicide would have been appropriate. He acknowledged that he did not raise an issue regarding lesser included offenses in the motion for new trial or on direct appeal.

Trial counsel testified that he filed a motion to suppress the statement the Petitioner made to Officer Jack Ruby on the morning after the crime. He said the basis of the motion was that the Petitoner did not give the statement voluntarily because the Petitioner was still under the influence of $500 worth of crack cocaine he and his co-defendant smoked the pervious night and because the Petitioner lacked impulse control because of his brain injury. He did not recall why the defense did not raise allegations that the Petitioner was assaulted before he gave the statement. He said the Petitioner did not testify at the suppression hearing because counsel did not think the Petitioner's testimony would provide additional support for the motion and did not want to expose the Petitioner to cross-examination.

Trial counsel identified a letter addressed to him from co-counsel stating that the defense should consider calling the Petitioner's treating psychiatrist, Dr. Barry Felder, to testify at the hearing on the motion to suppress. He did not recall why they did not call Dr. Felder at the hearing. He said the defense called Dr. Marsha Little, a neuropsychologist, to testify at the motion to suppress and the trial. Trial counsel stated that Dr. Little did not feel she was qualified to offer an expert opinion on the issue of whether using cocaine twelve to twenty hours earlier would render the Petitioner too impaired to give a voluntary statement. He acknowledged that an issue regarding the trial court's denial of the motion to suppress was not raised in the motion for new trial or on direct appeal. He said that he discussed hiring additional experts with the Petitioner's family but that they were unable to provide any funds.

Trial counsel testified that the defense requested funds for a mitigation expert, Dr. Frank Einstein, but that the court denied the request because the expert estimated that his fees for the case would be approximately $20,000. Trial counsel said he used this expert in the past with favorable results. He said the trial court ruled that the defense was permitted to spend $1000 each on an investigator and an expert. He said the trial court indicated its willingness to consider additional expert fees in increments of $1000 if the defense provided detailed itemization of its expenditures of the previous $1000. He said the trial court refused to approve expert fees for the Petitioner's doctors from California, who would have testified about the Petitioner's brain injury. Trial counsel said the trial court also denied his requests for a jury consultant and other experts.

With respect to the Petitioner's medical records from California, trial counsel testified that the trial court stated before the trial that the records would be admissible and could be introduced by the defense expert. Trial counsel stated, however, that the trial court did not permit admission of some of the California records at the trial. He acknowledged that the parties stipulated to the admissibility of part of the California records. He said the defense did not think the $1000 limit on expert assistance was an adequate amount for a proper defense of the Petitioner's case. He testified that the defense raised on appeal the issue of the admissibility of the excluded California records but that they did not raise an issue of the trial court's denial of funding for additional expert services.

On cross-examination, trial counsel testified that before he represented the Petitioner at trial, he had litigated five other capital cases and obtained a not guilty verdict in two of them. He said that in the Petitioner's case, one of the primary goals was to avoid the death penalty. He stated that although the insanity defense was not successful, they were able to avoid the death penalty. He said that although a jury charge on lesser included offenses was important, the main trial strategy was to convince the jury that the Petitioner was legally insane at the time of the crimes. He said this defense was the only viable option given the Petitioner's statement admitting guilt, the fact that there were two victims, and the surviving victim's identification of the Petitioner. He said they also tried to show that the co-defendant was the primary perpetrator of the crimes and that the Petitioner did not intend to murder anyone when he went to the victims' business.

The Petitioner testified that he was dissatisfied with the disparity between the sentence he received and his co-defendant's sentence of eight years for the homicide and twenty-five years for the robbery. We note that this court's opinion on direct appeal states that the co-defendant received sixty years for especially aggravated robbery and six years for criminally negligent homicide. See State v. Abraham Galmore, No. 02C01-9607-CR-00230, Shelby County (Tenn Crim. App. Sept. 9, 1997), aff'd 994 S.W.2d 120 (Tenn. 1999). The Petitioner said his co-defendant's case was tried first. He said that he gave his attorneys a newspaper clipping about the co-defendant's sentence and that co-counsel commented, "[I]t won't happen again." He said that before he gave counsel the clipping, they had communicated a plea offer that involved a life sentence. He said he did not think his attorneys raised any issue about the disparity between his co-defendant's sentences and the sentence he received of life without parole for the murder and twenty-five years for the robbery.

The Petitioner testified that he was shot in the head when he was a teenager. He said that as a result, he had brain damage that caused memory problems. He said that he received Social Security disability payments for his brain injury and that they were paid to his mother because he was too forgetful to handle his own affairs. He said he was never given an in-

depth mental evaluation. He acknowledged that his attorneys requested an evaluation but stated that the people who evaluated him visited him for fifteen minutes or less.

On cross-examination, the Petitioner testified that he had other complaints about his trial attorneys but that he could not remember them without his notes, which he forgot to bring to court. He recalled that counsel told him he would receive the death penalty if he went to trial instead of accepting the plea agreement involving a life sentence. He said the district attorney who prosecuted him offered the plea agreement but came into a back room alone and advised the Petitioner not to accept the plea because he would "never be able to go to court again." He said that his counsel were not present and that he did not tell them about the prosecutor's statement to him. He said he argued with co-counsel about declining the plea offer. He said that he paid co-counsel but that he was dissatisfied with co-counsel's services and relied on lead trial counsel at his mother's urging. He acknowledged that his attorneys attempted to present evidence about his brain injury through the defense expert, although the trial court excluded the evidence.

Alvene Gilmore testified that the Petitioner was her son. She said that the Petitioner was shot in the face when he was nineteen or twenty and that she provided information about the Petitioner's medical treatment in California to trial counsel. She said she was not present when trial counsel attempted to present this evidence at trial.

Ms. Gilmore testified that she and her husband took the Petitioner to the police station on the day he gave his statement and was arrested. She said she informed the police that the Petitioner had been shot in the face, was partially deaf, and had memory problems. She said that the Petitioner was "not in his right state of mind" and that he called her earlier that morning and told her two people were dead but he did not know who killed them. She said that the Petitioner told her he had been smoking crack all night and that she thought he was "somewhat high." She said she had never seen him in that condition. She stated that the Petitioner's fiancee, Stella Martin, met them at the police station and immediately grabbed the Petitioner and asked what was wrong with him. She said she thought Ms. Martin told the police that there was something wrong with the Petitioner's physical and mental state. She was unsure whether Ms. Martin testified at the suppression hearing.

Ms. Gilmore testified that she thought the jury should have heard evidence about the Petitioner's seizures because he had not been taking his Dilantin as he should have. She said the jury should have known that the Petitioner was not in his right state of mind.

The State called co-counsel, who testified that the Petitioner was his first capital murder client but that he practiced criminal law from 1991 until 1999, when he was retained by the Petitioner's mother. He said that after the case became a death penalty case, trial

11

counsel was appointed as lead counsel and that he served as "second chair." He said that he assisted in trial preparation and that his role was to handle the mitigation proof at the sentencing phase of the trial. Co-counsel was unable to recall whether he participated in preparing the appeal.

Co-counsel testified that he had a lot of contact with the Petitioner and the Petitioner's family. He said they obtained and reviewed extensive discovery, the Petitioner's significant medical records from California, and records from the Petitioner's previous incarceration. He said he believed the evidence of the Petitioner's mental state convinced the jury to spare the Petitioner a death sentence.

Co-counsel testified that he remembered having only one disagreement with the Petitioner. He said that trial counsel, the Petitioner, and he were in the lock-up area of the courthouse when the Petitioner began screaming and shouting. He stated that the Petitioner was concerned whether counsel were doing their best for him but that he eventually calmed down. He said that his relationship with the Petitioner and the Petitioner's family was always good and that he communicated thoroughly with his clients. He said he represented one of the Petitioner's family members after the Petitioner's trial. He said his relationship with trial counsel was also good.

On cross-examination, co-counsel testified that he did not recall whether he waived the preliminary hearing. He said that in the past, this had been a successful tactic to obtain early discovery.

Co-counsel testified that he requested the mitigation services of Dr. Einstein but that the trial court granted only a small budget for a medical expert. He said they submitted an estimate to the court but were told to "find a different way of dealing with this." He said he thought he recalled the trial court denying the defense request for funding to allow the Petitioner's California doctors to travel to Tennessee to testify about the brain injury. He could not recall why Dr. Little was not allowed to testify about some of the medical evidence they wanted to present. He did not think it was made clear to the defense before trial that Dr. Little would not be allowed to testify about medical evidence.

Co-counsel testified that the defense was to show that the Petitioner was impaired by his intoxication and brain injury and that the co-defendant had been the leader in the offenses and coerced the Petitioner. He said he thought the defense was prejudiced by the inability to present more expert testimony. He thought that in current cases, neurology was playing a greater role than it had in the past and that to the extent funds were available, there was more research done into a defendant's mental condition than there was at the time of the Petitioner's trial. He said he thought courts now were admitting more of this type of

evidence. He did not recall writing a letter to trial counsel recommending that they investigate the possibility of calling a psychiatrist who treated the Petitioner at Mid-South Hospital.

Co-counsel did not recall whether the trial court instructed the jury on lesser included offenses. He said that the defense may sometimes prefer "the all or nothing situation" but that in the Petitioner's case, he thought lesser included offense instructions would have been beneficial.

The trial court denied relief. The court found that trial counsel made a tactical decision not to request lesser included offense instructions based upon the theory of defense that the Petitioner was under the influence of drugs and had diminished capacity due to his brain injury. The court also found that trial counsel attempted to obtain additional expert assistance at trial but that their requests were denied. The trial court ruled that the Petitioner failed to establish by clear and convincing evidence that his trial counsel were ineffective.

On appeal, the Petitioner contends that the trial court erred in denying post-conviction relief. The State contends that the trial court properly denied relief. We hold the Petitioner has not shown that he is entitled to relief.

The burden in a post-conviction proceeding is on the Petitioner to prove his allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Fields, 40 S.W.3d at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.

13

The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In the context of a guilty plea, in order to prove prejudice, a petitioner "'must show that there is a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial.'" House v. State, 44 S.W.3d 508, 516 (Tenn. 2001) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

Our supreme court has held that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See id. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

### I. Lesser Included Offense Instructions

The Petitioner argues that counsel's ineffective assistance deprived him of lesser included offense jury instructions on reckless homicide and criminally negligent homicide. He also argues that he was entitled to lesser included offense instructions of facilitation for both the robbery and the homicide counts and that had counsel's assistance been effective in obtaining the instructions, he would not have been convicted of felony murder if he were found to have facilitated the crimes.

The record reflects that the trial court instructed the jury on the following offenses and lesser included offenses:

> Indictment 94-05550, Count 1
> First degree felony murder

Indictment 94-05550, Count 2[8]
First degree premeditated murder
Second degree murder

Indictment 94-05549
Especially aggravated robbery

The court also instructed the jury on criminal responsibility for the conduct of another as an alternative theory of criminal liability. See T.C.A. § 39-11-402 (2010).

We begin by examining the law at the time of the Petitioner's offenses. The trial court had the duty to charge the jury on all of the law that applied to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). Anything short of a complete charge would have denied the Petitioner his constitutional right to a trial by jury. See State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). At the time of the offenses and the Petitioner's trial in February 1996, the Code obligated the trial court to give the proper instructions, without regard to any request by the defendant:

> It is the duty of all judges charging juries in cases of criminal prosecutions for any felony wherein two (2) or more grades or classes of offense may be included in the indictment, to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so.

T.C.A. § 40-18-110(a) (1997) (amended 2001, 2009). At the time of the trial, however, our supreme court had said:

> While it is generally error in a homicide case for the trial court not to instruct the jury on all lesser included offenses, see Johnson v. State, 531 S.W.2d 558 (Tenn. 1975), where the record clearly shows that the defendant was guilty of the greater offense and is devoid of any evidence permitting an inference of guilt of the lesser offense, it is not error to fail to charge on

---

[8]Because the jury did not return a guilty verdict for first degree premeditated murder, we need not consider the propriety of the jury instructions for that count.

15

a lesser offense. State v. King, 718 S.W.2d 241, 245 (Tenn. 1986).

State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990); see also State v. Stephenson, 878 S.W.2d 530, 550, 662 (Tenn. 1994), abrogated on other grounds by State v. Salyor, 117 S.W.3d 239, 246 (Tenn. 2003).

## Lesser Included Offenses of Felony Murder

As noted by the Petitioner, this court held in State v. Gilliam that reckless homicide and criminally negligent homicide were the only lesser included offenses of first degree felony murder. See State v. Gilliam, 901 S.W.2d 385, 390-91 (Tenn. Crim. App. 1995) (holding that under the test of Howard v. State, 578 S.W.2d 83 (Tenn. 1979), second degree murder was not a lesser included offense of felony murder because second degree murder required a higher "knowing" culpable mental state than the "reckless" mens rea of felony murder). Gilliam was the controlling law at the time of the Petitioner's trial. Although Gilliam stated that the "only" lesser included offenses of first degree felony murder were reckless homicide and criminally negligent homicide, Gilliam involved only one criminal actor and did not address the applicability of the facilitation statute. That issue was controlled by State v. Lewis, which recognized facilitation as a lesser included offense of reckless felony murder. 919 S.W.2d 62, 67-68 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998).

Before evaluating counsel's conduct, we must determine whether the evidence supports a conclusion that the trial court had an obligation to charge the jury with lesser included offenses. The following definitions applied to the three lesser included offenses that were not instructed:

> **39-13-212. Criminally Negligent Homicide.** – (a) Criminally negligent conduct that results in death constitutes criminally negligent homicide.

> **39-13-215. Reckless Homicide.** (a) Reckless homicide is a reckless killing of another.

> **§ 39-11-403. Felonies; facilitation.** – (a) A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2),

the person knowingly furnishes substantial assistance in the commission of the felony.

See T.C.A. §§ 39-13-212, 39-13-215, 39-11-403 (2010).

The Code also provided definitions for the relevant culpable mental states:

> "Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

Id., § 39-11-106(a)(20) (2006) (amended 2009).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

Id., § 39-11-106(a)(4).

> "Reckless" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

Id., § 39-11-106(a)(31).

17

The Petitioner testified at the trial that he did not recall the events of the crimes. However, he gave two pretrial statements in which he claimed that his co-defendant held a pillow against the homicide victim's head, gave the Petitioner a gun, and told the Petitioner to shoot. The Petitioner's testimony that he did not remember committing the crimes does not contradict his earlier inculpatory statements to the police. The proof that the Petitioner fired a gun through a pillow into the victim's head reflects the greater, knowing culpability required for the predicate felony of felony murder, not the lesser culpability required for criminally negligence homicide or reckless homicide. Had the jury accepted the Petitioner's insanity defense, it would have acquitted him, not reduced the offense. See generally id., § 39-11-501(a) ("Insanity is a defense to the prosecution[.]") (emphasis added). Because the proof supported the existence of the greater offense but lacked evidence that would permit the jury to infer guilt of the lesser offenses, the trial court did not err by not giving the lesser included offense instructions. See Boyd, 797 S.W.2d at 593.

We also note the proof supporting a jury finding that the Petitioner was voluntarily intoxicated at the time of the offense. Voluntary intoxication is not a defense to a crime, but it may negate the culpable mental state for an offense. T.C.A. § 39-11-503 (2010). Evidence of voluntary intoxication does not negate the culpable mental state of reckless felony murder, but it may negate the specific intent required for the predicate felony. Wiley v. State, 183 S.W.3d 317, 333 (Tenn. 2006); see also T.C.A. § 39-11-503. The record reflects that the trial court gave a voluntary intoxication instruction for the felony murder count.

Next, we consider the trial court's lack of a jury instruction for facilitation. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility . . . the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403. Knowledge of the specific felony is shown in the case of felony murder by the knowledge that the other person was going to commit the predicate felony, not the felony murder. Lewis, 919 S.W.2d at 68. Like criminal responsibility, facilitation is an alternate theory of liability based upon a defendant's culpability for the actions of another person. See generally T.C.A. §§ 39-11-402 (Sent'g Comm'n Cmts), -403 (Sent'g Comm'n Cmts). "[V]irtually every time one is charged with a felony by way of criminal responsibility for the conduct of another, facilitation of the felony would be a lesser included offense." Lewis, 919 S.W.2d at 67.

For there to be proof to support a facilitation instruction for felony murder, the evidence would have to show that the Petitioner knew his co-defendant was going to commit a robbery and that he knowingly furnished substantial assistance to the commission of the felony, but that the Petitioner did not have the intent needed to be criminally responsible for

18

his co-defendant's crime. Both robbery and facilitation require a knowing mental state. The proof reflects that the Petitioner was present at the crime scene, that he demanded money, that he shot the homicide victim, and that he shared in the proceeds of the robbery. The Petitioner's proof did not contradict these facts. Had the jury believed the Petitioner was insane, he would have been guilty of no offense, including the lesser included offenses of felony murder and facilitation of felony murder. In either scenario, there would be no facts to support a finding of facilitation of felony murder. A lesser included offense instruction for facilitation of felony murder would not have been proper.

**Lesser Included Offenses of Especially Aggravated Robbery**

The Petitioner argues that if the jury had been properly instructed on the lesser included offenses of especially aggravated robbery, it could have found him not guilty of a robbery offense, and that a not guilty verdict for any robbery offense would have defeated the felony murder count as well. The offenses that could form the basis of the lesser included offenses of especially aggravated robbery are facilitation of especially aggravated robbery, aggravated robbery, facilitation of aggravated robbery, robbery, facilitation of robbery, theft, facilitation of theft, assault, and facilitation of assault. See generally T.C.A. §§ 39-13-401 to -403 (2010), 39-13-103 (2010), 39-13-101 (1991) (amended 2002, 2009), 39-11-403.

The Code provides these definitions for robbery offenses:

> **39-13-401. Robbery** – (a) Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear.

> **39-13-402. Aggravated Robbery.** – (a) Aggravated robbery is robbery as defined in § 39-13-401:

> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or

> (2) Where the victim suffers serious bodily injury.

> **39-13-403. Especially aggravated robbery.** – (a) Especially aggravated robbery is robbery as defined in § 39-13-401:

> (1) Accomplished with a deadly weapon; and

19

(2) Where the victim suffers serious bodily injury.

See T.C.A. §§ 39-13-401 to -403. All of the robbery offenses require intentional or knowing culpability. As we stated in our review of the lesser included offenses of felony murder, the State's evidence supported a finding that the Petitioner acted with knowing culpability, not criminal negligence or recklessness, during the robbery that formed the basis for the felony murder conviction. The existence of a lesser mental state would not have formed the basis for lesser included offense instructions for aggravated robbery or robbery. With respect to the absence of one or more of the remaining elements of aggravated robbery or robbery, we conclude that lesser included offense instructions were not required because the evidence undisputedly establishes both the use of a deadly weapon and serious bodily injury to the victim.

The Petitioner argues that the trial court should have instructed the jury on theft as a lesser included offense. Theft requires knowing conduct. See T.C.A. § 39-13-103. Any jury finding of a theft-based lesser included offense based upon evidence of voluntary intoxication that diminished the Petitioner's mental culpability would not have been possible because theft requires the same mental culpability as robbery. Thus, a jury determination that the Petitioner's culpability was less than knowing would defeat a subsequent jury finding that he was guilty of a knowing theft-based lesser included offense of robbery.

We consider now whether the trial court should have instructed the jury on assault-based lesser included offenses of robbery. Assault may be established by proof that the defendant "[i]ntentionally, knowingly[,] or recklessly cause[d] bodily injury to another." See id., § 39-13-101(a). Because the definition of assault includes recklessness, an assault-based lesser included offense could be a lesser included offense if the jury found that the Petitioner's voluntary intoxication reduced his otherwise knowing culpable mental state. The proof, however, belies a finding that the Petitioner recklessly assaulted the homicide victim. A reasonable jury could not find from the proof presented that the Petitioner, though intoxicated, acted merely recklessly in the robbery. The surviving victim testified that the Petitioner grabbed her and demanded money while the co-defendant held a gun to her husband's head. She said the Petitioner threatened to "blow [her] brains out" if her husband did not provide money. She also said the Petitioner apologized to her before shooting her in the back of the head. She said the Petitioner and his co-defendant then stabbed her repeatedly. She said that after the Petitioner and his co-defendant pillaged her home for valuables, the Petitioner joked about not wasting another bullet on her because she was already dead.

The Petitioner's trial testimony that he did not remember the events of the crime did nothing to challenge the State's version of events as recounted by the surviving victim.

20

Although the Petitioner's pretrial statements placed a greater culpability on the co-defendant, the Petitioner nevertheless admitted his participation in a robbery. The proof of the Petitioner's egregious conduct evinces that he was either guilty of a robbery or, based upon his mental state, was legally insane at the time of the crimes. We conclude, therefore, that the trial court had no legal obligation to instruct the jury on assault-related lesser included offenses of robbery. As with theft-based lesser included offenses, any jury determination that the Petitioner's diminished capacity reduced his culpability for robbery to a lesser level than the requirement of knowing conduct would defeat a subsequent jury finding that he was guilty of a knowing assault-based lesser included offense of robbery.

We also conclude that the trial court did not err in omitting instructions for facilitation of especially aggravated robbery or any of its lesser included offenses. As we noted above, facilitation requires a knowing mental state. The evidence of the Defendant's active participation in the crimes is overwhelming. A finding that the Petitioner merely facilitated the especially aggravated robbery or any of the lesser included offenses would necessarily be based on a showing that he was voluntarily intoxicated and that his impairment negated the knowing culpability required for robbery. However, such a showing would likewise negate a knowing culpability for facilitation. There is no proof that reasonable minds could accept to convict the Petitioner of facilitation of robbery. The trial court did not err in withholding a facilitation instruction for the robbery charge.

We also note this court's comments about the evidence in the Petitioner's direct appeal:

> Clearly, the evidence is overwhelming to find the appellant guilty, beyond a reasonable doubt, of felony murder and especially aggravated robbery. Thus, the only question is whether the appellant was legally sane at the time the offense was committed. The jury concluded that the appellant was sane and we agree.

James Hathaway, slip op. at 14-15.

We next consider whether trial counsel were ineffective because they did not raise an issue regarding lesser included offense instructions in the motion for new trial and on appeal. Although not raised by the parties, we note that approximately one month before the motion for new trial was adjudicated, the Tennessee Supreme Court held in State v. Trusty that a defendant was entitled to jury instructions on all lesser included offenses and on all lesser grades or classes of the offense charged if the evidence would support a conviction for the offense. 919 S.W.2d 305, 311 (Tenn. 1996). Thus, Trusty encompassed offenses meeting

21

the lesser included offense definition from Howard as well as offenses located in the same statutory chapter and part of the Tennessee Code. Id. We conclude, however, that had trial counsel raised a Trusty issue in the motion for a new trial or on appeal, the Petitioner would not have been entitled relief.

As discussed above, the facts of the greater charged offenses were overwhelmingly established in the Petitioner's case, there was no proof to support a finding of guilt for any of the lesser included offenses, and the trial court properly instructed the jury based upon the lack of evidence of guilt of any lesser included offenses. Had counsel raised the issue in the motion for new trial or on appeal, the Petitioner would not have prevailed.

We note that the supreme court's Trusty decision did not address second degree murder as a lesser included offense of felony murder. See generally Trusty, 919 S.W.2d 305. It was not until after the Petitioner's direct appeal was final, which was in October 1998, that the Tennessee Supreme Court held that second degree murder was a lesser grade offense of felony murder under Trusty. See State v. Ely, 48 S.W.3d 710, 722-23 (Tenn. 2001); see also Wiley v. State, 183 S.W.3d 317, 326 (Tenn. 2006) (stating that second degree murder was a lesser grade of homicide under Trusty). Even though Trusty provided the basis on which the Ely court relied for an instruction on second degree as a lesser included offense of felony murder, the Trusty court said that instructions on lesser included offenses were required only "if the evidence supports guilt on those offenses." Trusty, 919 S.W.2d at 311.

Because Trusty did not require lesser included offense instructions if the evidence did not support guilt of any lesser offenses, counsel cannot be said to have performed deficiently in failing to raise a non-meritorious issue under Trusty in the motion for new trial or on appeal, nor can the Petitioner establish prejudice. Likewise, the law as it existed at the time of the Petitioner's trial did not provide for a lesser included offense instruction for second degree murder, and had trial counsel raised the issue, the Petitioner would not have been entitled to relief.

## II. Additional Expert Witnesses

The Petitioner contends that trial counsel provided ineffective assistance when they failed to obtain proper expert witnesses. He argues that counsel should have pursued additional funding for mitigation testimony from Dr. Einstein. The State contends that the Petitioner failed to prove his claim. We agree with the State.

The Petitioner argues that trial counsel should have presented proof of a compelling need for Dr. Einstein's testimony. Trial counsel testified that Dr. Einstein had been used in other cases with favorable outcomes and that the defense was limited by the lack of expert

assistance. The Petitioner did not call Dr. Einstein or another medical doctor as a witness at the post-conviction hearing to demonstrate how proof from a medical doctor would have furthered the defense. Trial counsel testified that they tried to obtain more expert funding than the trial court allowed and that they submitted an estimate from Dr. Einstein for his services in the case to support their motion for expert services, which the trial court rejected as excessive. The Petitioner had the burden of proving his post-conviction allegations of fact by clear and convincing evidence. Because the Petitioner did not present evidence to support his allegation that expert testimony from Dr. Einstein would have made a difference in the outcome of his case, he is not entitled to relief.

In considering this issue, we acknowledge the proof at the post-conviction hearing that some of the Petitioner's pre-offense medical records were not admitted at the trial because Dr. Little was not a medical doctor and could not testify about them, despite trial counsel's belief before trial that the State would stipulate to the records' admissibility. This court's opinion on direct appeal reflects that trial counsel unsuccessfully challenged the trial court's ruling that portions of the Petitioner's records would not be admissible through the testimony of Dr. Little because the reports of non-testifying physicians were inadmissible hearsay. See James Hathaway, slip op. at 17-18. We likewise note that this court held on direct appeal that the trial court did not err in finding that Dr. Little was not a qualified expert to testify about the effects of cocaine on seizure disorders. See id. at 18-19. To the extent that the Petitioner contends that Dr. Einstein could have provided a foundation for admission of the excluded records or could have provided favorable testimony about the Petitioner's cocaine abuse affecting a seizure disorder, the Petitioner was required to present that proof at the post-conviction hearing. He did not do so and is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

23